IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs October 29, 2019 at Knoxville

**CASEY COLBERT v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 09-07785    James M. Lammey, Jr., Judge**

_____

**No. W2019-00383-CCA-R3-PC**

_____

The Petitioner, Casey Colbert, challenges the denial of his petition for post-conviction relief, wherein he attacked his jury convictions for first degree felony murder and attempted aggravated robbery. On appeal, the Petitioner raises numerous grounds of ineffective assistance of counsel, including that trial counsel was ineffective for failing to conduct reasonable investigation; failing to call various witnesses; failing to impeach and thoroughly cross-examine the State's witnesses; failing to present viable alibi and third-party perpetrator theories of defense; failing to object to the co-defendant's surprise testimony placing the Petitioner at the scene when notice of alibi had been given; and failing to object to improper closing argument by the State at trial. In addition, he raises allegations of newly discovered evidence and prosecutorial misconduct. Having reviewed the entire record and the briefs of the parties, we are constrained to agree with the Petitioner that the post-conviction court failed to make sufficient findings of fact and conclusions of law to enable appellate review of his claims. According, we reverse the judgment of the post-conviction court and remand this case for proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed;**
**Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and J. ROSS DYER, J., joined.

Casey Colbert (on appeal), Pro Se, Whiteville, Tennessee; and Claiborne H. Ferguson and Ramon Damas (at hearing), Memphis, Tennessee, for the appellant, Casey Colbert.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
## FACTUAL BACKGROUND

On May 7, 2009, twenty-two-year-old Ben Walker ("the victim") was shot and killed during an attempted robbery. Thereafter, the Petitioner and William Peete were jointly indicted for one count each of first degree felony murder committed during the perpetration of an attempted robbery, attempted aggravated robbery, and employing a firearm during the commission of a dangerous felony. See Tenn. Code Ann. §§ 39-12-101, -13-202, -13-402, -17-1324. Following the Petitioner's arrest for the murder, the Petitioner repeatedly called and sent numerous letters to his then-girlfriend, Tiffany Benson, to whom he had confessed his involvement in murder, in an attempt to coerce her not to testify against him. The Petitioner was subsequently indicted for two counts of bribing a witness and two counts of coercing a witness. See Tenn. Code Ann. §§ 39-16-107, -507. The trial court consolidated the offenses alleged in the two indictments for a single trial.

1. Trial. At the Petitioner's trial, the evidence in the light most favorable to the State established that on May 7, 2009, co-defendant Peete, accompanied by the Petitioner, drove to a Shell gas station on Highway 51 in Memphis. See generally State v. Casey Colbert, No. W2012-00099-CCA-R3-CD, 2013 WL 3128698 (Tenn. Crim. App. June 18, 2013), perm. app. denied (Tenn. Nov. 13, 2013). While there, co-defendant Peete encountered the victim and invited the victim, who was known to carry large amounts of cash, back to co-defendant Peete's house to smoke some marijuana.

After co-defendant Peete and the Petitioner retuned to co-defendant Peete's residence, the victim arrived approximately ten to fifteen minutes later in his pickup truck, accompanied by Shelby Thompson and Nicholas Parker. Co-defendant Peete walked over to the victim's pickup truck, and they shared a "blunt." While they were smoking, the Petitioner ran up to the truck and shot the victim during an attempt to rob him. The Petitioner ran from the scene, dropping the victim's wallet in the process.

Multiple witnesses testified against the Petitioner at trial. Charles Smith testified that on May 7, 2009, he was sitting in co-defendant Peete's car when the Petitioner walked up and told him that he, the Petitioner, intended to "pop" someone named "Ben" who had three or four thousand dollars on his person. Colbert, 2013 WL 3128698, at *2. According to Mr. Smith, to "pop" someone meant to both rob and kill. Mr. Smith later saw the Petitioner return from the gas station with co-defendant Peete.

Dana Pruett testified that the Petitioner spent a lot of time at her house, which she shared with co-defendant Peete and several others, including her boyfriend Joshua

- 2 -

Russell and her sister Stacy Pruett. Colbert, 2013 WL 3128698, at *2-3. Dana[1] testified that the Petitioner had a silver and black handgun and that she kept the gun in a drawer in her room to keep it away from the children. Dana said that about 10:30 p.m. on the evening of May 7, 2009, she heard a gunshot, followed by Mr. Russell's coming inside the house yelling that the victim had been shot.

Mr. Russell also testified that prior to the shooting, the Petitioner had told him that he "need[ed] a lick," meaning "[a]n easy way to come across money"; for example, coming across a car with the keys in it. Colbert, 2013 WL 3128698, at *4. Mr. Russell also testified that prior to the shooting, he had seen the Petitioner with a .40-caliber semiautomatic pistol with silver on it. Furthermore, according to Mr. Russell, the Petitioner called him on his cell phone after the victim was shot. Mr. Russell testified about the phone call: "[The Petitioner] said what are you doing. [Mr. Russell] said I'm in the back of the cop car, I think you know why. [The Petitioner] said I've been in the club for the last two hours. I can't hear you, I'm going to call you back when I go outside the club."

Heather Emery testified that she lived on the same property as Dana, Stacy, Mr. Russell, and co-defendant Peete, but in a different residence. Colbert, 2013 WL 3128698, at *5-6. Ms. Emery testified that during the three-day period before the shooting, the Petitioner frequented her residence and showed her a gun. According to Ms. Emery, on the day of the victim's death, the victim was in a good mood because he had finished a job and had "a good sum of money," about $2,500, which cash Ms. Emery saw the victim pull out and show to someone in the Petitioner's presence.

Ms. Emery also testified that about an hour or an hour and a half after she went to bed, the Petitioner came inside the residence, grabbed something, and left. She did not know exactly what the Petitioner had in his hand, but she described it as "wadded up." About thirty minutes later, Ms. Emery heard banging on the door, and when she answered, Dana Pruett was hollering that the victim had been shot and that they needed to do CPR.

Shelby Thompson and Nicolas Parker, passengers in the victim's truck, both testified. Colbert, 2013 WL 3128698, at *3-5. Neither could identify the shooter. Mr. Parker stated that the gun was a semiautomatic and "a larger caliber."

Co-defendant Peete testified against the Petitioner at trial. Colbert, 2013 WL 3128698, at *6-8. According to co-defendant Peete, sometime after 9:00 p.m., he was sitting in his car in front of his house drinking and smoking when the Petitioner came

---

[1] Because Dana and Stacy Pruett share a surname, we will sometimes, for clarity, refer to these witnesses by their first names. We intend no disrespect.

- 3 -

outside and joined him. Co-defendant Peete said that the Petitioner appeared "high" and that the Petitioner snorted cocaine and smoked marijuana while inside co-defendant Peete's car. Before leaving to go to the gas station, co-defendant Peete asked the Petitioner not to take his weapon, so the Petitioner put it in a different car.

Co-defendant Peete saw the victim while they were at the gas station and invited the victim over to smoke a "blunt." Co-defendant Peete testified that while on the way back to the house, the Petitioner told him that he intended to rob the victim because the Petitioner needed money. Co-defendant Peete said that upon their return to the residence, they sat in the car, and the Petitioner finished his cocaine. The Petitioner then got his gun out of the other car and went inside the house.

Co-defendant Peete claimed that a few minutes later, the victim arrived, that he went to the victim's truck, and that he and the victim smoked marijuana together. Co-defendant Peete said that as he was returning to his car, he saw the armed Petitioner jumping over a fence. Co-defendant Peete claimed that he confronted the Petitioner, who told co-defendant Peete to get out of the way. The Petitioner raised his gun, chambered a round, pointed his gun at co-defendant Peete, and then pushed co-defendant Peete out of the way, according to co-defendant Peete. Co-defendant Peete stated that as he started toward the main house, he saw a "flash" and saw the victim and the Petitioner both leave the victim's truck. Co-defendant Peete asserted that he watched the Petitioner follow the victim and then go through the victim's pockets before the Petitioner ran from the scene.

Co-defendant Peete admitted that he gave two prior police statements; that in the first statement, he claimed that he did not know the identity of the shooter; and that in the second, he said that someone else informed him that the Petitioner was the shooter. After co-defendant Peete gave his second statement to the police, the police arrested co-defendant Peete, and he was charged with the felony murder of the victim. Co-defendant Peete testified that as of the time he was testifying, his case had not been disposed of; however, he also stated that he had not received anything for his testimony. Co-defendant Peete further claimed that while this case had been pending, the Petitioner had threatened him several times if he testified against the Petitioner.

On cross-examination, co-defendant Peete denied that while he was inside the Shell gas station, he told Kevin Peete, a gas station employee, that he was going to try to rob the victim and that he was looking for a .40-caliber handgun. He stated that when the case was initially set for trial, the Petitioner told him that he, the Petitioner, "was going to take this charge." Co-defendant Peete denied that he saw Mr. Smith on the night of the shooting.

Benjamin Sykes testified that on the evening of May 7, 2009, he was visiting another friend, smoking marijuana, and drinking beer. Colbert, 2013 WL 3128698, at *8-

- 4 -

9. When Mr. Sykes saw police cars nearby, he called the Petitioner. According to Mr. Sykes, the Petitioner answered and sounded "[l]ike he was trying to catch his breath while he was running." The Petitioner told Mr. Sykes that he, the Petitioner, thought that he had shot someone. When the Petitioner called him later that night, the Petitioner asked Mr. Sykes, "did he die or anything?" to which Mr. Sykes responded affirmatively.

While Mr. Sykes was in jail on an unrelated offense, he encountered the Petitioner. According to Mr. Sykes, the Petitioner told him "to call this investigator and make another statement saying that [he, Mr. Sykes] was slow and [he was] on medication and that [he got] a check." The Petitioner also told Mr. Sykes that he should change his story to the effect that the caller was not the Petitioner and that it was hearsay. In addition, the Petitioner wrote Mr. Sykes a letter telling him how to change his story.

On cross-examination, Mr. Sykes denied that co-defendant Peete had discussed robbing the victim with him. He admitted that co-defendant Peete had talked to him on May 7 about "hitting a lick" but denied that co-defendant Peete referred to the victim's name.

Tiffany Benson testified that in May 2009, she was dating the Petitioner and that she later gave birth to the Petitioner's child. Colbert, 2013 WL 3128698, at *11-13. Ms. Benson stated that the Petitioner arrived at her house on the evening of May 7, 2009, wearing a ripped shirt and indicating that he wanted to talk to her. After Ms. Benson finished taking care of some matters with her mother, she joined the Petitioner in her bedroom. He was on the phone. When she asked him what he wanted to talk about, he told her that they would discuss it later. The Petitioner showered, and they got in bed and watched television. When Ms. Benson awoke around 3:00 a.m., she heard the Petitioner talking on the phone, and she "heard crying through the other side of the phone." She noticed the Petitioner watching the news, and when she asked the Petitioner what was going on, the Petitioner told her "that it was a plan, it [was] supposed to have been a plan," and "[t]hat he ran up to a truck and laid everybody down." He told her "that he tried to lay everyone down and the guy wouldn't lay down so he pulled the gun on him." He told her that after he pulled the gun, it "went off." The Petitioner told her that at that point, he "just started running." According to Ms. Benson, they went back to sleep.

Ms. Benson testified that although she did not want to, she testified against the Petitioner at the preliminary hearing. She claimed that the Petitioner called her after the preliminary hearing and asked her why she had testified against him. She stated that the Petitioner continued to call her many times before trial and that she later became fearful of him. Although she had told the Petitioner to stop calling her, he persisted even though she changed her phone number multiple times. The Petitioner also wrote her over one hundred letters, in spite of her requests that he stop writing her. Ms. Benson testified that on some occasions, the Petitioner would offer her money and to take care of her if she did

not go to court.  On another occasion, he threatened to take custody of their daughter.  Recordings of phone calls, as well as several of the letters, were admitted as exhibits at trial.

On cross-examination, Ms. Benson admitted that she did not call the police after the Petitioner told her that he thought he had shot someone or after she heard the news report about a fatal shooting.  She claimed that she did not call the police because she was afraid. She further stated that she continued having conversations with the Petitioner because he was the father of her child.

In addition, Janis Dunavant, Director of Administrative Services for the Shelby County Criminal Court Clerk's Office, identified a hand-written document styled "Motion to Suppress False Affidavits in Court Case" that had been filed in the Petitioner's case.  Colbert, 2013 WL 3128698, at *11.  While the document did not contain a signature, the Petitioner's name was printed at the end, following the phrase "respectfully submitted."  Ms. Dunavant admitted that she did not know who authored the document and that she did not know if the contents of the document were true or false.  This motion was used by Ms. Benson to identify the Petitioner's handwriting in the letters he sent her.

Following the presentation of the proof, the Petitioner was convicted as charged. He received an effective sentence of life plus twenty-two years for these convictions.

2. Direct Appeal.   The Petitioner appealed his convictions and sentence to this court arguing, among other things, that the trial court erred in consolidating the witness coercion and bribery offenses with the other offenses.  Colbert, 2013 WL 3128698, at *1. Upon review, this court concluded the trial court erred in consolidating the bribing and coercion of witness indictments with the first degree murder and attempted aggravated robbery indictments.  Id. at *17-24.  In regard to the Petitioner's convictions for first degree murder and attempted aggravated robbery, we concluded that the trial court's error was harmless, and affirmed those convictions and sentences.  Id.  However, we concluded that the error was not harmless as to the convictions for bribery and coercion of a witness and reversed and remanded.[2]  Id.  We also reversed and vacated the Petitioner's conviction for employing a firearm during the commission of a dangerous felony due to insufficient evidence.  Id. at *16.

---

[2] Upon remand, the Petitioner entered guilty pleas to two counts of bribery of a witness and two counts of coercion of a witness.  State v. Casey Colbert, No. W2017-01998-CCA-R3-CD, 2018 WL 4960225, at *1 (Tenn. Crim. App. Oct. 15, 2018), perm. app. denied (Tenn. Feb. 25, 2019).  The trial court imposed an effective sentence of ten years' incarceration, and its sentencing decision was affirmed on appeal.  Id. at *1, 6.

3. <u>Post-Conviction Proceedings</u>. The Petitioner's pro se petition for post-conviction relief was filed on September 17, 2014.[3] Therein, the Petitioner raised sixteen allegations of ineffective assistance of counsel and four allegations of prosecutorial misconduct. Following the appointment of counsel, the "Petitioner's First Amendment to the Original Petition for Post-Conviction Relief" was filed. After counsel was relieved from the Petitioner's representation, the Petitioner, pro se, filed a second amended petition for post-conviction relief. When a new attorney was appointed, a third amended petition was filed. Counsel was thereafter relieved from the Petitioner's representation, and a third attorney was appointed to the Petitioner's case. Following the Petitioner's third attorney's being permitted to withdraw, the Petitioner filed a pro se "Amended Petition for Post-Conviction Relief."

Next, a fourth attorney, who ultimately represented at the Petitioner at the post-conviction hearing, was appointed and prepared a "[Third][4] Amended Petition for Post-conviction relief" on the Petitioner's behalf. The amendment claimed to "clarify with specificity all grounds for relief that will be presented at the [P]etitioner's" post-conviction hearing. Relative to ineffective assistance of counsel, the Petitioner submitted that (1) trial counsel failed to call material witnesses, those being Kevin Peete, Joshua Walton, Stacy Pruett, Lieutenant Bart Ragland, Detective Mark Miller, Ashley Boyd, Bernard Martin, Darrius Bell, and Vita Zelikou; (2) trial counsel failed to impeach Heather Emery, Joshua Russell, Benjamin Sykes, and Tiffany Benson; (3) trial counsel failed to present evidence of Benjamin Sykes's guilt of the crime; (4) trial counsel failed to object to co-defendant Peete's undisclosed testimony in violation of Rules of Tennessee Criminal Procedure 12 and 16 and move to have said testimony suppressed as a result; (5) trial counsel failed to object to "the improper leading of the [S]tate's witnesses," Tiffany Benson and Benjamin Sykes; (6) trial counsel failed to object to the State's improper closing arguments; (7) trial counsel failed to object to admission of "a false affidavit motion" and allowed a lay witness, Tiffany Benson, to make a comparison of that document to the Petitioner's handwriting when it became clear that the State intended to use the motion as "a quasi-confession"; (8) trial counsel's failure to present conflicting identifications of the suspect made by Nicolas Parker, William Peete, Joshua Russell, and Shelby Thompson; (9) trial counsel's failure to request special jury instructions regarding inconsistent statements and the Petitioner's incarceration; and (10) trial counsel's failure to investigate the "entire case" and "argue the facts to the jury that [were] consistent with the defense theory of the case that the Petitioner was the scapegoat." Relative to prosecutorial misconduct, the Petitioner alleged that (1) the State impaired his right to a fair trial and prevented him from presenting "a complete defense"

---

[3] The Petitioner stated that he delivered the petition to the appropriate prison officials for mailing on June 24, 2014.

[4] Numerically, this amendment would in fact be the Petitioner's fifth.

by failing to inform the Petitioner that co-defendant Peete would place the Petitioner at the crime scene, thus violating discovery obligations pursuant to Rules of Tennessee Criminal Procedure 12 and 16; (2) the State withheld exculpatory evidence in violation of Brady, that being Lieutenant Bart Ragland's report from May 8, 2009, which could have been used to impeach co-defendant Peete; (3) the State knowingly elicited "false testimony" from co-defendant Peete and Joshua Russell; and (4) the State made inappropriate arguments during closing and "argued facts not in evidence."

A post-conviction hearing was held on November 14th and 15th of 2018. At the outset, post-conviction counsel indicated that he had reviewed with the Petitioner the multiple amendments to the original petition and the issues presented therein, and counsel averred, "So we're going to try to—we've talked about narrowing and focus down and getting to the points that could lead to reversal in a post-conviction. I think we're good with that." Post-conviction counsel did not make any further opening statement of the issues to be presented.

Trial counsel was called to testify and detailed his criminal trial experience. Trial counsel stated that when he "first got" the Petitioner's case, no one could identify the shooter based upon the evidence he had received at that time, the only description being that the shooter was "wearing a hoodie or something" and "ran off into the woods." According to trial counsel, the trial strategy was to argue identity, meaning that the Petitioner was not the shooter.

Trial counsel confirmed that he filed a notice of alibi on August 26, 2010; however, one-week later, the State filed a September 3, 2010 motion for notice of alibi. In the Petitioner's alibi notice, which was exhibited to the hearing, it was averred that Walter Patterson would be able to testify as to the Petitioner's whereabouts on May 7, 2009, around 10:30 p.m. that evening. Trial counsel agreed that the State did not file any response to the alibi notice informing him that it had a witness who would place the Petitioner at the scene, and trial counsel conceded that he did not know the State was obliged to provide such a response under Tennessee Rule of Criminal Procedure 12.1(b).[5]

---

[5] Rule 12.1(b) governs the State's response to a defendant's notice of alibi:

> (1) Disclosure. If the defendant serves a notice pursuant to Rule 12.1(a)(2), the district attorney general shall disclose in writing to the defendant the name and address of:
>     (A) each witness on whom the state intends to rely to establish the defendant's presence at the scene of the alleged offense; and
>     (B) each witness on whom the state intends to rely to rebut testimony of any of the defendant's alibi witnesses.
> (2) Timing. Unless the court directs otherwise, the district attorney general shall serve this notice within ten days after receiving defendant's notice of alibi but in no event less

Trial counsel agreed that he told the jury during opening argument that "not one witness will come in here and put [the Petitioner] on the scene." According to trial counsel, he was "shock[ed]" when co-defendant Peete testified at trial for the State and placed the Petitioner at the scene, which testimony trial counsel described as "detrimental to the defense." Trial counsel insisted that had he been given proper notice of co-defendant Peete's testimony, he would not have made that statement to the jury during his opening argument. Trial counsel could not offer any explanation as to why he failed to object or request a mistrial when the State presented co-defendant Peete as a witness.

Trial counsel recalled Joshua Russell's testimony that the Petitioner called Mr. Russell's cell phone after the victim was shot. Trial counsel agreed that he received the Petitioner's phone records in discovery; however, he could not remember whether the defense investigated the records prior to trial to determine if the calls made around the time of the offense matched up with witnesses' statements or whether he reviewed the records during trial in an effort to impeach witnesses testifying about phone calls with the Petitioner. The phone records were admitted as an exhibit to the hearing.

Trial counsel was also asked about using the 911 call to impeach Mr. Russell's testimony "that he saw the shooter run off." Trial counsel testified that he listened to the 911 call before trial and agreed that a man who identified himself as Josh interrupted the original caller. The man stated to the 911 operator "that he didn't see anything but [that] they need[ed] to get there in a hurry." Trial counsel did not recall using the 911 call to impeach Mr. Russell.

Trial counsel confirmed that the defense investigator's notes indicated that Kevin Peete was working at the Shell gas station when co-defendant Peete entered around 10:00 p.m. and said that someone had $1800 and "we're about to get him." Trial counsel stated, "[I]t was almost like there was this buzz going through the neighborhood about [the victim's] having this money and everybody wanted to try to rob him of this money." Trial counsel agreed that if he had asked co-defendant Peete about the statement and co-defendant Peete had denied making it, then he could have called Kevin[6] to testify to impeach co-defendant Peete's testimony.

Trial counsel affirmed that the Petitioner's then-girlfriend, Tiffany Benson, also implicated the Petitioner in the murder. According to trial counsel, Ms. Benson testified

than ten days before trial.

In addition, the State is under a continuing duty to disclose evidence subject to the rules of discovery, and additional evidence discovered before or during trial shall be promptly disclosed. Tenn. R. Crim. P. 16(c).

[6] Because this witness shares a surname with co-defendant William Peete, we will sometimes, for clarity, refer to him by his first name, Kevin. Again, we intend no disrespect in so doing.

at the Petitioner's preliminary hearing that the Petitioner "confessed to her when they saw it on the news." Trial counsel opined that Ms. Benson's testimony "was very shaky" at the preliminary hearing, and at that point, he felt "like that was all [the State] had" as proof of the Petitioner's guilt.

Trial counsel further noted that the Petitioner "kept writing [Ms. Benson] all these letters"; he "just wouldn't stop," possibly writing her "over fifty letters where he was telling her what to say" at trial. Trial counsel recalled that the State presented between fifteen to twenty such letters at the Petitioner's trial and that in one of those letters, the Petitioner offered to "perform oral sex on" Ms. Benson in exchange for her cooperation. The Petitioner also called Ms. Benson from jail multiple times, telling her to claim she was coerced. The Petitioner even used other inmate's accounts to place the calls in effort to avoid detection. Trial counsel indicated, "It was very, very frustrating trying to defend [the Petitioner]" based upon the Petitioner's behavior while incarcerated. Trial counsel opined that the Petitioner "screwed up his own case."

Trial counsel recalled Ms. Benson's trial testimony that she woke up around 3:00 a.m. on the morning following the murder and that she heard the Petitioner talking on the phone at that time. However, trial counsel did not recall attempting to impeach Ms. Benson with the Petitioner's phone records. Counsel indicated that even if there had been a basis for such impeachment, he probably would not have attempted to do so given the Petitioner's numerous letters and phone calls to Ms. Benson.

Relative to Heather Emery, trial counsel affirmed that Ms. Emery testified to seeing the Petitioner's entering the house and his getting "some kind of clothing or something[,] . . . that was in a ball and some kind of clothes balled up and left." After being shown Ms. Emery's police statement, trial counsel agreed that Ms. Emery stated therein, "I think my husband told me that [the Petitioner] came in and got a shirt before [the victim] was shot." Trial counsel could not remember whether he cross-examined Ms. Emery about these inconsistent statements; he agreed that had he done so, it would have impacted Ms. Emery's credibility with jury.

Although shown a statement from Joshua Walton, trial counsel could not recall any details from that statement. In Mr. Walton's statement, which was admitted as an exhibit, Mr. Walton identified a fellow inmate, co-defendant Peete, and said that this inmate told him to say that the inmate was not involved in the victim's murder, and that if Mr. Walton did so, this inmate's significant other would pay Mr. Walton's bail.

Trial counsel confirmed that in addition to the Petitioner's identity defense, he attempted to point the finger at Benjamin Sykes as a possible third-party perpetrator. At trial, during cross-examination, trial counsel got Mr. Sykes to admit that he had talked with co-defendant Peete about "hitting a lick," but Mr. Sykes denied that co-defendant

- 10 -

Peete referenced the victim's name. Trial counsel confirmed that his investigator had drafted a report referring to Mr. Sykes's statements that Mr. Sykes had discussed with co-defendant Peete robbing the victim specifically, as well as robbing a Mexican restaurant. Trial counsel acknowledged that Mr. Sykes's trial testimony was contrary to the information provided in the investigator's report, which information could have served as a basis for impeachment.

Trial counsel explained "[t]hat would have been all good again," except for the Petitioner's behavior while in jail. Trial counsel noted that the Petitioner had spoken to Mr. Sykes while the two men were incarcerated together and that the Petitioner had tried to coerce Mr. Sykes into changing his testimony; Mr. Sykes testified to as much at the Petitioner's trial. Trial counsel described the Petitioner's behavior as "horrible" and "frustrating" because the Petitioner would not listen to any of the advice trial counsel gave him.

On cross-examination, trial counsel agreed that he received open file discovery from the State, including the witnesses' statements. Trial counsel affirmed that he reviewed the investigator's reports in the Petitioner's case and that he made decisions about which witnesses to call accordingly. Trial counsel opined that it would be difficult to use an investigator's report for impeachment purposes because the report only provides an idea of what a witness discussed with the investigator, witnesses were often uncooperative and changed their stories, and any witness statements contained in the report were not signed under oath or notarized. However, trial counsel also agreed that it was sometimes possible to call the investigator as a witness.

Trial counsel confirmed that he handled the Petitioner's preliminary hearing, where he was able to observe Ms. Benson, who was pregnant with the Petitioner's child at that time, testify. He recalled that "she may have initially stated she didn't know." Although Ms. Benson was not cooperative with the State at first, she became more cooperative as time passed due to the Petitioner's frequent letters and phone calls, ultimately turning over to the State every letter that the Petitioner had sent to her. Again, trial counsel noted that it was the Petitioner who "undercut his entire case."

Additionally, trial counsel was asked about his decision not to impeach potential third-party perpetrators, like co-defendant Peete or Benjamin Sykes. Trial counsel explained that it was common to make a "strategic choice" between impeaching someone and leaving a question open-ended in order to argue the point to the jury. Trial counsel opined that any third-party perpetrator would have only denied involvement in forming a robbery plan and that impeaching co-defendant Peete about forming a plan to rob the victim was "a double-edged sword" if the defense was that the Petitioner was not there. Trial counsel indicated that he did not want to eliminate any possibility of pointing the finger at Mr. Sykes by impeaching him with the investigator's report, noting that Mr.

- 11 -

Sykes had also told the investigator that he was not interested in co-defendant Peete's plan to rob the victim.

Importantly, trial counsel affirmed that the jury was aware that co-defendant Peete was charged for his involvement in the victim's murder. Trial counsel did in fact ask Mr. Sykes on cross-examination about forming a plan with co-defendant Peete to rob the victim; although Mr. Sykes denied such an accusation, Mr. Sykes did convey that the two men had discussed "hitting a lick" or robbing someone, just not the victim. Furthermore, trial counsel indicated that he attempted to further point the finger at Mr. Sykes by asking Mr. Sykes about his height and weight, which was similar to the description of the shooter.

Moreover, trial counsel believed that he thoroughly impeached co-defendant Peete on his failure to name the Petitioner in his earlier statements as the shooter. Although trial counsel did not call Kevin Peete to testify, co-defendant Peete specifically denied on cross-examination that he told Kevin while he was in the Shell gas station that he was going to try to rob the victim and that he was looking for a .40-caliber handgun. Trial counsel said that he also cross-examined co-defendant Peete about his hopes for a plea deal in exchange for his testimony against the Petitioner, as well as about his previous lies to the police.

Relative to impeachment of Mr. Russell with the 911 call, trial counsel explained that Mr. Russell's trial testimony was that he was inside, heard the shot, went outside, and saw a black male running off into the woods. Therefore, trial counsel agreed that Mr. Russell never identified the black male as the shooter and that Mr. Russell's testimony was consistent with the 911 call.

Relative to impeachment of Ms. Emery with her inconsistent statements, trial counsel explained that the significance of Ms. Emery's testimony was that she placed the Petitioner in the area and that she said she saw him with a gun prior to the day of the offense. Trial counsel opined that impeaching Ms. Emery on whether she or her husband saw the Petitioner with the clothes would not have affected the verdict.

Relative to presentation of an alibi defense, trial counsel asserted that the Petitioner's letters and jail calls precluded trial counsel from pursuing an alibi defense. Trial counsel explained that the Petitioner's alibi witness, Walter Patterson, did not testify because trial counsel could not "ethically" put Mr. Patterson on the stand. When asked about the Petitioner's phone records, trial counsel stated that by the time his investigator "began to piece those together to make sure" they "link[ed] up" with the witnesses' statements, the Petitioner had already tried to coerce witnesses through letters and conversations to testify falsely, making additional admissions in the process.

While trial counsel acknowledged that witnesses could place the Petitioner in the area of the crime scene before the shooting and that the Petitioner matched the description of an individual seen running from the scene, trial counsel opined that they "possibly could have" been successful at trial given the lack of evidence identifying the Petitioner as the shooter and of forensic proof linking the Petitioner to the crime. Trial counsel also factored into this opinion co-defendant Peete's status as a co-defendant, co-defendant Peete's lack of credibility, and co-defendant Peete's motive to lie, as well as the number of people who discussed robbing the victim in the days prior to the offense. However, trial counsel noted once again that it was the Petitioner himself who provided the biggest obstacles to the presentation of any viable defense. Trial counsel indicated that Ms. Benson sealed the Petitioner's fate when she testified that the Petitioner confessed to her.

Although trial counsel claimed that he was surprised by co-defendant Peete's testimony, trial counsel acknowledged that there was always a possibility of a co-defendant's testifying. Trial counsel affirmed that regardless of his surprise, he "knew about every witness that was involved in the case," knew everything that the State had against co-defendant Peete, and had co-defendant Peete's statements, although co-defendant Peete did not identify the Petitioner as the shooter in those statements. Trial counsel averred that he did not expect co-defendant Peete to "change his story for a third time." According to trial counsel, during closing argument, he emphasized co-defendant Peete's "motive to lie and to tell a story that was in his best interest."

Kevin Peete testified that co-defendant Peete came into the Shell gas station where he was working on the evening of May 7, 2009, and said, "[W]e getting ready to go get" a pistol, a .40 or .45 caliber, and "to get Ben" because "Ben had some money." Kevin believed they were going to rob the victim, and the victim died fifteen minutes later.

Kevin gave an official statement to police on May 9, 2009, confirming therein that the gas station had video and audio surveillance recordings. According to Kevin, "everything [co-defendant Peete] said was" recorded, and the recordings were supposed to have been in the State's possession. Also, in his police statement, Kevin told the officer that following the victim's death, around 11:00 p.m. that evening, Stacy Pruett called him and requested that he tell the police that co-defendant Peete had come into the store and asked where he could get forty-dollars' worth of "weed" rather than telling them that co-defendant Peete said he was going to get a gun.

Kevin testified that he came to the Petitioner's trial but left after he was told that his testimony was not needed. Kevin agreed that he did not know to whom co-defendant Peete was referring when co-defendant Peete said "we," that he did not know who was in co-defendant Peete's car at the time co-defendant Peete came inside the gas station, and that he did not witness the shooting.

- 13 -

Darrius Bell testified that his phone number ended with the last four digits -5851; that he had this same number for almost seventeen years; that on May 7, 2009, this was his phone number; and that the Petitioner had been a friend of his from the neighborhood since 2001. Mr. Bell testified that he never spoke to trial counsel and agreed that he would have been able to testify at the Petitioner's trial.

According to Mr. Bell, the Petitioner called him between 10:00 and 11:00 p.m. on the night of the offense, and they made plans to "hang[] out" later that evening. Mr. Bell testified that he had not seen the Petitioner in person for a couple weeks prior to the offense and that he had not spoken to the Petitioner on the phone in weeks, possibly months, before that time.

Bernard Martin testified that he was friends with the Petitioner at the time of the offense in 2009 and that he thought his telephone number was -7449 at that time, although Mr. Martin could not recall for certain what his number was and had since changed numbers. Mr. Martin testified that did not speak with anyone from trial counsel's office about being a witness for the Petitioner and that he was never interviewed by the police about the offense. Mr. Martin indicated that he would have been able to testify at the Petitioner's trial if asked to do so.

The Petitioner maintained that trial counsel did not cross-examine the witnesses as he should have, despite trial counsel's assertions to the Petitioner not to worry about such matters. The Petitioner claimed that he told trial counsel to use the 911 call—specifically Josh's assertion that he did not see who shot the victim—to impeach Mr. Russell's trial testimony that "the suspect" he saw running into the woods was consistent with the Petitioner's appearance. The Petitioner also noted trial counsel's failure to impeach Heather Emery's trial testimony that she personally observed the Petitioner come inside the house and retrieve the wadded up clothing with Ms. Emery's police statement that it was her husband who told her that the Petitioner came inside and retrieved the clothing.

The Petitioner further asserted that he requested trial counsel call Kevin Peete and Joshua Walton to testify on his behalf. Regarding Kevin Peete, the Petitioner entered a photographic array wherein Kevin identified co-defendant Peete as the man who came inside the gas station just before the shooting. Relative to Joshua Walton, the Petitioner claimed that he discussed Joshua Walton's police statement with trial counsel. According to the Petitioner, he told trial counsel that he thought the statement was important to impeach co-defendant Peete's credibility and to show that co-defendant Peete was trying to bribe witnesses into offering false testimony. The Petitioner claimed that the inmate's significant other was Stacy Pruett, who had also tried to get Kevin Peete to make a false statement to police. The Petitioner believed that this evidence was important to aid in his defense that he was being "framed."

The Petitioner claimed that he performed his own research regarding his cell phone records on the evening of the shooting. The Petitioner asserted that the phone records showed that he only spoke to Darrius Bell and Bernard Martin after the crime; thus, trial counsel should have impeached Benjamin Sykes with the phone records in an effort to establish that the Petitioner did not speak with Mr. Sykes following the crime and confess, as Mr. Sykes claimed. The Petitioner noted that Mr. Sykes testified at trial that he was using a woman's phone when he called the Petitioner shortly after the shooting. The Petitioner asserted that it was important to call Mr. Bell and Mr. Martin as witnesses to show that Mr. Sykes did not use their phones to make this call.

The Petitioner referenced Tennessee Rule of Criminal Procedure 12.1 about notice of alibi and the State's duty to respond to the Defendant's notice, as well as Rule 16 regarding discovery procedures, including the State's duty of continued disclosure. He affirmed his desire for the court to take "judicial notice of the rules." The Petitioner asserted that he was "unfairly surprised" by co-defendant Peete's testimony at trial. Additionally, the Petitioner noted that co-defendant Peete had given two police statements that were contrary to his trial testimony. The Petitioner opined that trial counsel should have called Detective Mark Miller to testify about the contents of co-defendant Peete's prior statements in an effort to further impeach co-defendant Peete's credibility.

The Petitioner confirmed that prior to trial he had filed "a motion to suppress false affidavits because [he] had determined that the affidavit that had [him] arrested was false." According to the Petitioner, trial counsel should have objected under Tennessee Rule of Evidence 403 to the prosecution's using this motion as a handwriting sample for Tiffany Benson to compare the letters she received from the Petitioner. The Petitioner claimed that the State also attempted to use the motion during closing argument "as a quasi-admission" by the Petitioner; an argument which should have also garnered an objection from trial counsel in the Petitioner's opinion.

Post-conviction counsel asked the Petitioner if there were any additional issues that he wanted to bring to the post-conviction court's attention. The Petitioner averred that he filed "a writ of error coram [nobis] and . . . submitted two affidavits" to the court. Post-conviction counsel stated that there indeed did appear to be such a filing in the record and that the coram nobis petition did not get filed separately but "just got stuck in this jacket. . . . For whatever reason it either didn't get filed right or it's the wrong jacket." The Petitioner believed that the court might "be able to consolidate" the coram nobis petition with these post-conviction issues because he had brought the newly discovered evidence to the court's attention and such matters were "relevant to issues alleged in [his] petition" for post-conviction relief." The post-conviction court informed the Petitioner that if it was newly discovered evidence, then it did not relate to the

Petitioner's ineffective assistance of counsel issues, which was "the reason" for current hearing. The post-conviction court noted that the problem was that the Petitioner wrote "so many things" even though he was represented by counsel, so his hand-written motions did not get considered. The Petitioner indicated that he understood but averred that his newly discovered evidence went to prosecutorial misconduct.

On cross-examination, the Petitioner said that he never had "multiple conversations" with trial counsel wherein trial counsel asked him to stop communicating with others through letters and phone calls. The Petitioner also claimed that they "never discussed the case in full" or any potential defense strategy. The Petitioner maintained that his post-arrest behavior while incarcerated did not relieve trial counsel of trial counsel's obligation to present a viable defense on his behalf.

The Petitioner did not dispute that his phone records showed Mr. Bell's calling while the Petitioner was calling another number, showed another set of overlapping calls a few minutes later, and showed an overlapping call when Bernard Martin allegedly called. When the Petitioner was asked to identify specific phone numbers from around the time of the offense that were displayed in his phone records, the Petitioner claimed not to recall who he was calling, asserting that he was trying to reach a woman he had just met but could not remember her entire number, so he kept dialing random numbers beginning with 282. The Petitioner affirmed that the records showed that he called Joshua Russell on the evening of the offense.

The Petitioner confirmed that he did not testify at trial, stating that he made such decision upon the advice of trial counsel because his criminal record would have been presented to the jury and would "ruin" his credibility. He claimed that he might have testified had he known that the State could only ask about the convictions but could not go into the details. The Petitioner confirmed that the trial court asked him questions about his choice not to testify before he made his final decision.

4. Closing Arguments and Post-Conviction Court's Ruling. Following the conclusion of proof, post-conviction counsel made a closing argument on behalf of the Petitioner. Post-conviction counsel noted that some of the Petitioner's issues were "stronger than others." Post-conviction counsel's argument focused on three issues: the first being the State's failure to respond to the Petitioner's alibi notice by informing the defense that co-defendant Peete would testify and place the Petitioner at the scene, as well as trial counsel's corresponding failure to request suppression of co-defendant Peete's testimony or ask for a mistrial if trial counsel was surprised by such testimony, especially in light of trial counsel's failure to fulfill the promise made during opening argument; the second being trial counsel's failure to impeach the witnesses or adequately cross-examine the witnesses, specifically mentioning co-defendant Peete and Mr. Sykes; and the third being that trial counsel failed to object during closing arguments to the

State's improper comments about the motion's being a quasi-admission. Post-conviction counsel stated that it was not his intent to waive any of the Petitioner's additional issues despite his declining to make an argument regarding those issues. Post-conviction counsel further submitted that the cumulative effect of the errors prejudiced the Petitioner.

In response, the State noted that trial counsel testified he could no longer ethically present an alibi defense as they got closer to trial and that "[t]here was plenty of finger pointing" at co-defendant Peete. Although not admitting there was a violation of the alibi rule, the State commented that "there was complete discovery in this case," including access to co-defendant Peete's statements, as well as there being "multiple people in addition to [co-defendant] Peete who put the [Petitioner] in and around that scene near the time of the shooting." The State submitted "that there was very strong impeachment" of co-defendant Peete and noted the Petitioner's own inculpatory admissions to witnesses, in addition to the Petitioner's subsequent attempted coercion of those witnesses. Moreover, the State asserted that it had no legal duty to correct any misstatement by trial counsel during opening argument. The State indicated that the proper remedy for any rule violation may have been to declare a mistrial and have a retrial, rather than prohibit co-defendant Peete from testifying. The State surmised that even if there were a rule violation, the Petitioner had not established prejudice given the strong evidence of his guilt.

Relative to impeachment of witnesses, the State contended that trial counsel made a tactical, strategic decision "not to go down some of those avenues of impeachment." The State noted trial counsel's testimony that he had concerns "if they started eliminating other people who [might] have been involved with [co-defendant] Peete," then it would have "continued to point the finger back at" the Petitioner. The State continued that by trial counsel's not asking those questions, he was able to argue such inferences of others' guilt to the jury. The State also submitted that some of the impeachment issues "were trivial," citing to Ms. Emery's inconsistent statements about the Petitioner's coming inside and obtaining wadded up clothing, observing that "[t]he timeline didn't change regardless of whether or not" she was impeached on that issue. The State concluded that the Petitioner was not prejudiced by any failure of trial counsel's to properly impeach the State's witnesses.

Finally, the State argued that there was not any improper argument made during closing, noting that the Petitioner had indeed made inculpatory admissions. The State also noted that regardless of whether the word admission or confession was used, the trial court "probably gave the proper instruction which would have cured any error."

The post-conviction court then made several oral findings of fact and conclusions of law. The post-conviction court noted that the Petitioner could have testified in his own

defense at trial; however, "it wasn't looking real good" for the Petitioner at that point in the trial, and the jury "would have found out that [the Petitioner] had a prior conviction for theft." Moreover, the witnesses presented by the Petitioner at the post-conviction hearing "would [not] have helped [the Petitioner] at all," according to the post-conviction court.

Relative to the State's failure to respond to the notice of alibi, the post-conviction court observed that the notice of alibi was filed by the Petitioner before the State's request for such notice was filed. The post-conviction court commented, "It doesn't sound like the prosecution and the defense were on the same page. But when you look at this whole thing in reality it's no big surprise when a co-defendant turns on his co-defendant. . . . [T]hat happens a lot." The post-conviction court noted that the rule was not specific when dealing with witnesses of whom a defendant was already aware, such as a co-defendant, and the defense had already received the statements from the State's witnesses; in such a case, the post-conviction court was unsure if the rule required the State to re-list those witness in a formal response. The post-conviction court commented,

It doesn't really make sense that that would be the case.

If they had new witnesses I suppose or I mean if you've already got the statements of all the witnesses, you've got copies of the police supplements where the witness is talking. You already know everything about it. So you could just assume that well, the only person that could really place him there would be the co-defendant. It would be no big surprise. . . .

Really truth be told the State probably wasn't sure he was going to testify even when he did or what he was going to testify to. So many times they'll take the witness stand and testify against the State.

The post-conviction court also commented that the rule used the word "may," thus providing a trial court with discretionary authority as to the appropriate remedy and not requiring suppression of the evidence. The post-conviction court observed that if trial counsel had gotten "wind that the co-defendant was going to testify before trial," then trial counsel could have requested a continuance. However, the post-conviction court determined that even if a continuance had been granted, it would not have affected the outcome of the trial because the co-defendant would still have testified.

The post-conviction court concluded that trial counsel did not render deficient performance nor was the Petitioner prejudiced by any alleged deficiencies. The post-conviction court found trial counsel to be credible, as well as the Petitioner's credibility lacking. The post-conviction observed that the Petitioner was the "architect of his own

demise" and that "[t]he only prejudice" the Petitioner suffered "was at his own hands," indicating that the Petitioner "sabotage[ed himself] every step of the way" by sending letters and placing phone calls to Ms. Benson. The post-conviction surmised that by the time the Petitioner's case went to trial, the proof against him "was overwhelming."

The post-conviction court's written order denying relief was filed on January 31, 2019. The post-conviction court incorporated its oral ruling from the bench, concluding that the Petitioner had failed to prove ineffective assistance of counsel. This timely appeal followed.

## ANALYSIS

The Petitioner proceeds pro se on appeal. In his appellate brief, he restates a multitude of issues that were raised in his numerous petitions for post-conviction relief and the multiple amendments thereto. His initial brief is fifty pages in total, much of it hand-written. It is also accompanied by an appendix, wherein the Petitioner attempts to present his coram nobis claims of newly discovered evidence, including affidavits from two witnesses, Mario Perkins and Cortrial Farmer.[7] The Petitioner also filed a twenty-two-page, hand-written reply brief.

On appeal, the Petitioner argues that trial counsel failed "to conduct reasonable investigation of the entire case." The Petitioner asserts that had trial counsel been adequately prepared, the following witnesses should have been presented in his defense: Joshua Walton, Detective Mark Miller, Kevin Peete, Bernard Martin, Darrius Bell, defense investigator Vita Zelikou, and Walter Patterson. He presented testimony from Mr. Peete, Mr. Martin, and Mr. Bell at the post-conviction hearing. In all, the Petitioner presented eighteen exhibits at the post-conviction hearing.

Relative to Mr. Martin and Mr. Bell, the Petitioner argued that trial counsel failed to conduct a reasonable investigation into the Petitioner's phone records, which the Petitioner exhibited to the post-conviction hearing, claiming those records discredited the trial testimony of Benjamin Sykes and Joshua Russell about statements the Petitioner allegedly made to them. Furthermore, the Petitioner presented Mr. Walton's statement at the hearing, wherein Mr. Walton claimed that co-defendant Peete attempted to bribe him in exchange for favorable testimony. The Petitioner also alleged that trial counsel should have called Detective Miller based upon the contents of Detective Miller's May 8, 2009 report, so that Detective Miller could testify about co-defendant Peete's inconsistent statements.

---

[7] On October 24, 2019, just before this case was set on the October 2019 Knoxville docket, the Petitioner filed a motion with the court asking that we acknowledge receipt of the appendix. Let this serve as such as acknowledgement.

According to the Petitioner, trial counsel failed to present viable alibi and third-party perpetrator defenses. The Petitioner avers that trial counsel should have called Kevin Peete in this regard. According to the Petitioner, Kevin's testimony was relevant and highly probative regarding "whether [co-defendant] Peete was being truthful and went to whether or not someone else committed the crime." Trial counsel also "could have shown the jury that Stacy [Pruett] was an accessory after the fact, who tainted several witnesses['] testimony and created the [Petitioner] as the suspect in an attempt to cover for the real suspects or culprits," either co-defendant Peete or Benjamin Sykes.

In addition to establish Mr. Sykes as a third-party perpetrator, the Petitioner asserts that trial counsel should have called his defense investigator Vita Zelikou "who would have testified to the interviews conducted of witness Benjamin Sykes, Joshua Russell, and the findings of the 911 tape review." A report from the investigator referred to Mr. Sykes's statement that he discussed with co-defendant Peete robbing the victim by name, as well as robbing a Mexican restaurant. Finally, the Petitioner notes that Walter Patterson was listed as the Petitioner's alibi in the notice, but he was not called at trial.

Intermingled with these allegations is the Petitioner's assertion that trial counsel failed "to use readily available evidence to impeach" witnesses Heather Emery, Joshua Russell, Benjamin Sykes, Tiffany Benson, and William Peete; said evidence being the inconsistent statements from Ms. Emery about the Petitioner's retrieving the wadded up clothing; the Petitioner's phone records; the information from the 911 call; the investigator's report concerning the interview with Mr. Sykes; and co-defendant Peete's various statements, as well as the presentation of Kevin Peete.

The Petitioner also argues that trial counsel failed to object or request a mistrial when co-defendant Peete gave surprise testimony placing the Petitioner at the scene and the Petitioner had given notice of alibi. Thus, according to the Petitioner, the State was in violation of Tennessee Rules of Criminal Procedure 12.1(b) and 16(c), warranting sanctions. Likewise, the Petitioner contends that trial counsel failed to object to improper closing argument by the State referring to the Petitioner's motion to suppress false affidavits that was admitted for handwriting comparison but was being used by the State as "a quasi-admission."

The Petitioner raises an allegation of the cumulative effect of trial counsel's errors, as well as allegations of prosecutorial misconduct related to many of these same claims. He also attempts to bring claims of newly discovered evidence.

As a threshold issue, the Petitioner submits that the post-conviction court failed to make sufficient findings to enable appellate review. The State responds that the post-conviction court sufficiently explained its reasons for denying relief by finding trial counsel credible, as well as finding the Petitioner's credibility lacking, and noting that the

post-conviction court found that none of the Petitioner's ineffective claims entitled him to relief. Nonetheless, the State acknowledges that the post-conviction court failed to address all of the Petitioner's claims. Despite this failure, the States contends that the record is adequate for review to address the Petitioner's various claims, and cites to Allen Booker v. State, No. W2017-01662-CCA-R3-PC, 2018 WL 3832657 (Tenn. Crim. App. Aug. 10, 2018), in support of its claim.

When determining the merits of a post-conviction petition, the Post-Conviction Procedure Act requires the post-conviction court to make written findings of fact and conclusions of law. A trial court's final disposition of a petition for post-conviction relief "shall set forth in the order or a written memorandum of the case all grounds presented, and shall state the findings of fact and conclusions of law with regard to each such ground." Tenn. Code Ann. § 40-30-111(b) (emphasis added). The use of the word "shall" clearly indicates the Tennessee General Assembly intended that the duty of the post-conviction court to make findings of fact be mandatory. Donald Mays v. State, No. W2003-02761-CCA-R3-PC, 2004 WL 2439255, at *6 (Tenn. Crim. App. Oct. 28, 2004). Not only do the post-conviction court's findings of fact facilitate appellate review but, in many cases, they are necessary for such review. Id. Where the post-conviction court fails to make "a clear and detailed finding of fact," either orally or on the record, the appellate court is "at a complete loss to know the basis of the trial judge's decision and judgment; assignments of error and appellate review are seriously frustrated if not completely thwarted by lack of a definitive finding of fact by the trial judge." Brown v. State, 445 S.W.2d 669, 671 (Tenn. Crim. App. 1969).

In the case before us, the record is devoid of several findings of fact and conclusions of law critical to our review. These include: (1) the precise issues of ineffective assistance of counsel that are being addressed and found to be without merit, such as trial counsel's investigation, impeachment of witnesses, presentation of relevant evidence, establishment of available defenses, and lack of any objection during closing argument; (2) an examination of the exhibits presented by the Petitioner at the post-conviction hearing—such as the Petitioner's phone records, the 911 call, the investigator's report, the detective's report, and the various witnesses' statements—as they relate to the ineffective issues he presented, (3) an analysis of Kevin Peete's testimony, Mr. Martin's testimony, and Mr. Bernard's testimony, rather than the conclusory statement that the witnesses presented "would [not] have helped [the Petitioner] at all"; and (4) any adjudication of the Petitioner's claims of prosecutorial misconduct.

We note that the post-conviction court did make explicit credibility determinations and accredited trial counsel's testimony. However, the post-conviction court also commented that it was "no big surprise when a co-defendant turns on his co-defendant."

Nonetheless, trial counsel testified that he was "shock[ed]" by the co-defendant's testimony, and the previous statements of the co-defendant differed markedly from his trial testimony. While the post-conviction court noted that there was a potential discovery violation that possibly merited a continuance, there was minimal discussion regarding how trial counsel's "surprise" effected presentation of the Petitioner's defense or the impact of trial counsel's statement to the jury during opening argument that no one would place the Petitioner at the scene.

We take this opportunity to point out that a "finding of fact" is the post-conviction court's opportunity to fulfill its responsibility to sort through all the evidence and set forth what actually happened, as opposed to just each witness's version of what happened. See Charles Bradford Stewart v. State, No. M2015-02449-CCA-R3-PC, 2017 WL 2645651, at *14 (Tenn. Crim. App. June 20, 2017). We also find the Booker case cited by the State to be distinguishable on its facts. See 2018 WL 3832657. In Booker, the initial pro se petition was filed, and following the appointment of counsel, a single amended petition was filed. Id. at *1. Moreover, the post-conviction court in Booker reviewed the testimony presented at the evidentiary hearing, including the Petitioner's various complaints, before concluding that the Petitioner failed to meet his burden of showing that his counsel's performance was deficient and that the deficient performance prejudiced the outcome of the proceeding. Id. at * 5. None of this procedural history is present in the Petitioner's case. Here, there were numerous filings by the Petitioner and his multiple attorneys with multiple issues presented therein; the issues certainly were anything but clearly defined. In addition, the post-conviction court engaged in very limited review of the testimony and evidence presented at the post-conviction hearing before finding that all of the Petitioner's issues were meritless. Thus, the record in Booker, and corresponding analysis, does not correlate to enabling appellate review in this case.

We also observe that the Petitioner attempts to raise error coram nobis claims of newly discovered evidence. He attached an appendix to his appellate brief, presumably in an attempt to restate or reassert those coram nobis claims, which were not dealt with during the post-conviction hearing. At the hearing, there was mention by post-conviction counsel of a coram nobis pleading's being filed by the Petitioner, although one is not evident from the technical record on appeal. The affidavit from witness Mario Perkins that is attached to the Petitioner's appendix is included in the technical record twice. However, during the hearing, the Petitioner was instructed by the court that they were not in court to address those types of claims and to limit his allegations to those relating to ineffective assistance of counsel. It is unclear from the record if this filing exists and whether it was appropriately dealt with, i.e., being assigned a separate case number on the post-conviction court's docket if the Petitioner's claims were not consolidated with the post-conviction petition. The fact that the Petitioner was represented by counsel on his

- 22 -

post-conviction petition does not prevent the Petitioner from filing separate actions pro se.  Upon remand, the post-conviction court should also determine the appropriate avenue to dispose of the Petitioner's claims of newly discovered evidence.

Without sufficient factual findings and conclusions of law, we are unable to properly address the merits of Petitioner's claims.  See, e.g., Steven Tyler Nabi v. State, No. M2017-00041-CCA-R3-PC, 2018 WL 1721869, at *4 (Tenn. Crim. App. Apr. 9, 2018) (reaching a similar conclusion).  Given that many of the Petitioner's issues are intertwined, we decline to piecemeal these proceedings and, accordingly, believe a complete remand to be in order.

## CONCLUSION

Accordingly, we reverse the judgment of the post-conviction court and remand for further proceedings consistent with this opinion.  After an order is entered in compliance with the requirements of the post-conviction statutes and this opinion, the losing party shall be entitled to initiate an appeal in accordance with the Tennessee Rules of Appellate Procedure.

_____

D. KELLY THOMAS, JR., JUDGE